## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-CR-20033-DPG

**UNITED STATES OF AMERICA**

**vs.**

**JERRY VERNELUS,**

   **Defendant.**
_____/

### THE UNITED STATES OF AMERICA'S RESPONSE
### IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files this response in opposition to Defendant's Motion to Suppress [DE 157]. The Defendant's motion should be denied because (1) the warrant is not overbroad and is sufficiently particular; (2) even if the warrant is overbroad, the *Leon* good faith exception applies; (3) the evidence the Defendant seeks to suppress was properly seized pursuant to the plain-view doctrine; (4) the evidence the Defendant seeks to suppress would have been discovered through lawful means; and (5) the evidence is admissible pursuant to the independent source doctrine.

### I.   <u>Background</u>

#### A.   **The charged crimes**

On January 25, 2023, a federal grand jury returned a 45-count Indictment charging Jerry Vernelus ("Defendant" or "Vernelus") and six (6) others with conspiracy to commit access device fraud (beginning at least as early as in or around July 2020, and continuing through in or around April 2021), in violation of Title 18, United States Code, Section 1029(b)(2), possession of fifteen (15) or more unauthorized access devices, in violation of Title 18, United States Code,

Section 1029(a)(3), and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A(a)(1)[1]. An arrest warrant was issued on the same date. On February 21, 2023, the arrest warrant was executed at the Defendant's residence, and the Defendant was subsequently taken into custody. The Defendant was out on bond in state of Florida case F20-16017 at the time of his arrest.[2]

    **B.**    **Summary of the evidence**

The FBI and the City of Miami Police Department have been conducting a joint investigation since August 2020 into the "Little Haiti Vulchas" ("LHV") gang, a neighborhood-based gang in the Little Haiti area of Miami, Florida. The investigation was initiated in response to a rise in shootings and violent incidents in the Little Haiti area. Through the course of the investigation, law enforcement identified LHV had a long-standing rivalry with another neighborhood-based gang in the Little Haiti area known as the "77th Street" gang, also known as the "Everybody Eats" ("EBE") gang. The ongoing rivalry between these two gangs is believed to be the cause of multiple shootings and homicides in the Little Haiti area. Since March 2019, law enforcement attributes at least thirty-two (32) violent incidents (including shootings, carjackings, and homicides) to the ongoing gang rivalry and general criminal conduct of both 77th Street and LHV. Of those violent incidents, nine (9) are open homicide investigations. LHV operates primarily in the Southern District of Florida, and in addition to violent crimes, LHV is also involved in fraud related crimes. The gang funds its activities largely through fraud. The gang uses various access device fraud and wire fraud schemes to steal funds from victims. The group obtains PII (i.e., names, dates of birth, credit card numbers, bank account numbers, and social security numbers) in various ways, including from the "dark web" and through the

---

[1] Vernelus was charged with four (4) counts of aggravated identity theft.
[2] Vernelus is charged with Carrying a Concealed Weapon and Possession of a Firearm by an Adjudicated Delinquent in state of Florida state case F20-16017.

commission of robberies and burglaries. The PII is used in several different ways, including but not limited to, credit card fraud and bank account takeover schemes. In a bank account takeover scheme, members of the group steal from a victim's bank accounts and wire the funds into other people's bank accounts before ultimately using the funds to unjustly enrich themselves. This Defendant is known by law enforcement to be a gang member or associate of LHV.

On or about January 19, 2019, the Defendant was sentenced to a term of probation in state court. On October 9, 2020, the Defendant's probation officer conducted a curfew check at his home. Later the same day, the Defendant's wife contacted the Defendant's probation officer to inform him that after the probation officer left, the Defendant told her that the probation officer was looking for a gun, but that luckily, he had hidden his gun in another room in a safe. Shortly thereafter, the Defendant's wife contacted his probation officer again and stated "[…] I just found out he does fraud and carry guns I did not know he was hiding a gun from you." On November 2, 2020, City of Miami officers discovered a video (that Defendant sent using a Facebook account which he is known by law enforcement to utilize), which depicts the Defendant running towards a passing vehicle and brandishing a firearm towards it. During the video, the Defendant states, "that was the opps […] I ain't gonna lie, I shoulda dropped it."[3] Law enforcement thereafter obtained a warrant to search the Defendant's residence for evidence of the crime of Possession of a Firearm by a Juvenile Delinquent. The warrant authorized law enforcement to seize any cellular phones that could indicate ownership, residency, or occupancy of the residence or that was capable of storing surveillance footage from the home's Ring camera. Upon executing the search warrant at the Defendant's residence (on November 19,

---

[3] According to the search warrant at issue here, "'opps' is street slang meaning rival gang members. […] [W]hen Mr. Vernelus says he should have 'dropped' the vehicle, it means that he should have shot at it. […] [E]ssentially what Mr. Vernelus is saying in the video is that the passing vehicle was occupied by the rival gang and that he should have shot at it as it drove away." DE 157-1 at 4.

2020), law enforcement located a firearm, ammunition, and magazines. Law enforcement also located the Defendant's white Apple iPhone (hereinafter "Vernelus's Phone") on his bed; his Florida learner's license was inside of his phone case. Upon picking up the phone, the photo on the lock screen appeared, which depicted a photograph of the Defendant.

Law enforcement thereafter obtained a search warrant, authorizing law enforcement to search Vernelus's Phone (hereinafter, the "City of Miami Search Warrant"). According to the City of Miami Search Warrant, law enforcement wanted to "locate and authenticate the surveillance footage of Jerry Vernelus with a firearm that he sent via Facebook messenger [and] to identify Mr. Vernelus's cousin 'Tony', who he stated is the owner of the firearm that he possessed." DE 157-1 at 9. According to the City of Miami Search Warrant affidavit, "information may be recovered from cellular telephones that identify the owner and/or operator of the cellular phone." *Id.* The affidavit further states that it is important in investigations like this "to establish that the subject had possession of [the phone] before, during, and after the offense. *Id.* Because this evidence "must frequently be proven circumstantially, the forensic examiner may need to compile a time line of activities stored by the phone surrounding the times of the offenses." *Id.*

### C.    Search of Vernelus's Phone

Vernelus's Phone was forensically examined pursuant to the City of Miami Search Warrant by the City of Miami. While searching Vernelus's Phone, Sergeant Blake Weinger, the Affiant of the City of Miami Search Warrant, observed photographs of semi-automatic rifles, handguns, and other LHV members handling firearms. Sergeant Weinger also observed conversations about fraud, as well as PII, in plain view. The forensic examination of Vernelus's Phone pursuant to the warrant also revealed that the last phone number associated with the phone

4

was 509-907-2657. The phone was provided to the FBI on January 15, 2021; it was thereafter further examined by FBI Special Agent Joseph Lavelle. The City of Miami Search Warrant permitted law enforcement to search "all digital photographs […] tending to show ownership and/or dominion and/or control" over Vernelus' s Phone and "in order to identify other subjects that conspired to commit" the crime of "Possession of a Firearm by a Juvenile Delinquent." DE 157-2 at 3. While searching the phone pursuant to the City of Miami Search Warrant, Special Agent Lavelle observed the PII of at least 40 individuals within Vernelus's Phone, in plain view. The City of Miami Search Warrant also permitted law enforcement to search electronic communications, DE 157-2 at 3, for evidence of the crime of possession of a firearm by a juvenile delinquent. The review of the phone revealed a text message conversation between the Defendant and a co-conspirator in the instant case, Eric Cadet ("CADET"), on November 1, 2020. On November 1, 2020, Vernelust sent CADET a message that stated, "Slilipp.xyz." According to law enforcement "Slilpp" is a darknet underground market for paypal, bank, and shop logs. The Defendant then asked, "What's the jwett," meaning "what's the fraud/scheme?" CADET responded that he was trying to see, "Target red card[s]." It should be noted that the co-conspirators in the instant case were involved in a Target red card and gift card fraud scheme; the co-conspirators often purchased gift cards using the PII obtained from their fraudulent schemes. The Defendant also sent CADET a message stating, "Blackpass.cc," which is a site used to illegally download PII.

Law enforcement also discovered a group chat in Vernelus's Phone, which included the Vernelus and co-conspirators Damian Woodard ("WOODARD"), Jovis St Luc ("ST LUC"), and CADET; The Defendant initiated the chat. On October 31, 2020, the Defendant asked if anybody

has a "cvv."[4]. One of the other unidentified participants of the group chat sent PII (including a Victim's name, address, and complete credit card number) to the group. On November 4, 2020, the Defendant again asked for a "cvv." The same group chat was also located by law enforcement in ST LUC's phone, which was recovered by law enforcement on August 25, 2021, and searched pursuant to a Florida state search warrant issued on September 7, 2021.

In summary, the forensic examination of Vernelus's Phone recovered on November 19, 2020, revealed a continuous conspiracy to share and download PII for the purposes of self-enrichment. The Defendant participated in LHV group chats that discussed not only gang activity, such as violence and shootings, but ways to defraud banks and their unsuspecting customers. It should be noted that the Defendant was on probation in state of Florida cases F17-15721 and F17-15722, between January 19, 2018 and December 10, 2020.[5] It should also be noted that the Defendant was ultimately charged in Florida state case F20-16017 with Possession of a Firearm by a Felon/Juvenile Delinquent and Carrying a Concealed Firearm for the firearm and ammunition that was located in the Defendant's residence during the search there on November 19, 2020.

### D.  Additional Investigation

In January 2023, a picture was shared on Instagram depicting the Defendant holding a large stack of cash (over one foot high) on his lap, a fan of money in his right hand, and his middle finger up in his left hand. The Defendant is wearing several gold rings on his left hand. The picture includes a tag to Instagram username "Ferrariyon," which is the Instagram username known by law enforcement to be utilized by the Defendant.[6] The photograph was shared by

---

[4] "CVV" is the 3-digit number on a credit card that adds an extra layer of security when making purchases online or over the phone. According to law enforcement, the term "CVV" is used to refer to PII generally.
[5] The judgments and sentences in cases F17-15721 and F17-15722 were vacated in December 2020.
[6] "Tagging" identifies someone in a post, photo, or status update shared on Instagram.

Instagram username "ot_gwopo," which is an account known to be utilized by O.O., a known associate of LHV who was recently released from a federal sentence of 36 months' imprisonment for fraud and aggravated identity theft-related charges. *See* 19-CR-20636-CMA.



In February 2023, law enforcement observed a video shared on Instagram of the Defendant holding thousands of dollars of US currency. In the video, the Defendant and the same known associate of LHV, O.O., are seen counting thousands of dollars stating, "new money" and "7 block gets money." "7 block" is a street-slang name for LHV.



It should be noted that, at the time of the Defendant's arrest, the Defendant had no reported income with the Florida Department of Revenue.

### E.  The Defendant's Motion

On November 7, 2023, the Defendant filed a Motion to Suppress, arguing that the search warrant for the Defendant's phone was unconstitutionally overbroad and failed to meet the particularity requirement. The Defendant also claims that the search exceeded the scope of the warrant. The Defendant requests that "all evidence of access device fraud and PII extracted from Mr. Vernelus' cell phone should be suppressed." DE 157 at 17.

### II.   Argument

### A.   The search warrant is not unconstitutionally overbroad and is sufficiently particular

The Defendant argues that the City of Maimi Search Warrant was unconstitutionally overbroad and fails to meet the particularity requirement. The Defendant is incorrect.

The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. "In order for a search to be reasonable, the warrant must be specific. Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *United States v. Lebowitz*, 647 F. Supp. 2d. 1336, 1351 (11th Cir. 2009) (citations omitted) (internal quotations omitted). "Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Martinelli*, 454 F. 3d 1300, 1307 (11th Cir. 2006). "Courts reviewing the legitimacy of search warrants should not interpret

supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing *Illinois v. Gates*, 462 U.S. 213, 236-37 (1983)).

Here, the City of Miami Search Warrant clearly stated the property sought; the scope of the warrant was also limited by the probable cause on which the warrant was based. In making their overbreadth argument, the Defendant ignores the fact that the scope of the property sought by the warrant was limited to evidence relating to Vernelus possessing a firearm despite being a juvenile delinquent, and evidence attributing Vernelus's Phone to him. By "explicitly limiting the scope of what could be seized to evidence of the crimes under investigation," the warrant here was "sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized." *United States v. Mesika*, 2018 WL 2124899, at *10 (N.D. Ga. Mar. 30, 2018), report and recommendation adopted. 2018 WL 2125949 (N.D. Ga. May 7, 2018). Pursuant to the Fourth Amendment, all warrants must "particularly describ[e] the place to be searched, and the . . . things to be seized." U.S. Const. amend IV. "The particularity requirement prevents "general, exploratory rummaging in a person's belongings." *United States v. Bradley*, 644 F.3d 1213, 1259 (11th Cir. 2011) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). However, "elaborate specificity is unnecessary." *Id.* (citing *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984)). "The description is considered sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *Id.*; *Bradley*, 644 F.3d at 1259. "It is universally recognized that the particularity requirement must be applied with a practical margin

of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982). The scope of the particularity clause is limited to "two matters... the place to be searched and the persons or things to be seized." *United States v. Grubbs*, 547 U.S. 90, 97 (2006), 126 S.Ct. 1494, 1500 (internal quotation marks omitted); *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000).

The Eleventh Circuit has held that warrants are sufficiently particular when they include limitations on what may be seized based on the crimes under investigation, holding that such limitations enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized. For example, in *United States v. Santarelli*, 778 F.2d 609 (11th Cir. 1985), the Eleventh Circuit upheld a warrant that authorized the seizure of "all property" constituting evidence of loansharking crimes. *Id.* at 613–14. The defendant later moved to suppress certain items seized in the search, including desk-top calendars, index cards, and slips of paper, all bearing notations relating to interest payments. *Id.* at 614. The district court denied the motion to suppress, and the Eleventh Circuit affirmed, noting that although these documents were not specifically described in the search warrant, they were properly seized because they fell within the portion of the warrant authorizing the seizure of "all property" constituting evidence of loansharking. *Id.* The Eleventh Circuit stated:

> because there is no evidence that the FBI had additional information that would have allowed the warrant applicant to give a more particularized description of the loansharking evidence located in Santarelli's residence, we ... conclude that the warrant satisfied the particularity requirement of the fourth amendment.

*Id.* at 615. Similarly, in *Signature Pharmacy, Inc. v. Wright*, 438 F. App'x 741 (11th Cir. 2011), the Eleventh Circuit found a warrant to be sufficiently particular that authorized seizure of a

number of items, such as documents, records, and computer equipment that were evidence of a criminal violation of laws prohibiting bad faith manufacture, purchase, sale, or delivery of anabolic steroids by prescription, and laws prohibiting the distribution of controlled substances. *Id.* at 745–46. The Eleventh Circuit held that "[b]ecause the descriptions in the warrants refer to items that are evidence of a violation of certain statutes relating to the sale of controlled substances, the items were described with sufficient particularity to allow Wright, a seasoned law enforcement officer, to identify the things to be seized." *Id.* at 746 (citing *United States v. Betancourt*, 734 F.2d 750, 754–55 (11th Cir. 1984)). Like the searches in *Santarelli* and *Signature Pharmacy*, the Affiant of the City of Miami Search Warrant could not give an exact description of the items to be seized, but the warrant was "as specific as the circumstances and nature of the activity under investigation permit[ted]." *Wuagneux*, 683 F.2d at 1349.

The Defendant also argues that the lack of a temporal limitation in the City of Miami Search Warrant renders it "fatally overbroad." DE 157 at 13. There is no binding authority holding that a temporal limitation is a *mandatory* requirement for a warrant. *See United States v. DSD Shipping*, A.S., No. 15-00102-CG-B, 2015 WL 5164306, at *8 n.9 (S.D. Ala. Sept. 2, 2015) ("a temporal restriction appears to be an element of determining particularity of data seized, but the case law cited does not indicate temporal restrictions are mandatory requirements."). In fact, in an opinion that came out almost three (3) years after the City of Miami Search Warrant was issued, the Eleventh Circuit stated that the "*preferred*" method of limiting the scope of a search warrant for a "cloud" account will usually be "time-based." *McCall*, 84 F.4d at 1328 (emphasis added). While time-based limitations may be preferred, the lack of a temporal limitation is not "fatal." In *United States v. Blake*, 868 F.3d 960 (11th Cir.

2017), the Eleventh Circuit merely found it "somewhat troubling" that a warrant served on Microsoft seeking categories of emails related to sex trafficking charges did not limit the emails sought to the time of the alleged conspiracy. *Id*. at 973 n.7; *see also United States v. Addaquay*, 2021 WL 1899355, at \*5 (N.D. Ga. Feb. 18, 2021) (referring to *Blake* as the "seminal case" on temporal limitations in warrants and quoting its conclusion that "the mere lack of temporal limitation did not render [the challenged warrants] unreliable at least based on the state of the law."). In *McCall*, the Eleventh Circuit further clarified that "[t]he circumstances of an investigation may *not* require any subject- or time- limitation on a cloud warrant or may require that a sufficiently particular warrant include a subject-matter limitation." *McCall*, 84 F.4th at 1328. Here, given the circumstances of the investigation, including the fact that law enforcement did not know when Vernelus obtained the gun, a time-limitation was not required; rather, a subject-matter limitation was practical and protective of Vernelus's privacy interests and served as a meaningful limitation. *Id.; see also United States v. Haimowitz*, 706 F.2d 1549, 1555 (11th Cir. 1983) (noting that, in the staleness context, "[i]n general, the basic criterion as to the duration of probable cause is the inherent nature of the crime.").

The Defendant's conclusory statement that, "Every and all categories without any temporal limitation screams of general warrant," (DE 157 at 14), does not explain why the lack of temporal limitation, or why the categories of evidence sought by law enforcement, render the warrant invalid, especially given that categories of evidence requested specifically limit law enforcement to search for evidence of the listed statute, "Florida Statute § 790.23 Possession of a Firearm by a Juvenile Delinquent." *See Blake*, 868 F.3d at 963 n.7 ("[T]he warrant was appropriately limited in scope because it sought only discrete categories of emails that were connected to the alleged crimes."). Paragraphs 1-12 of the City of Maimi Search Warrant

expressly limit the search and seizure to materials that are relevant to prove that the Defendant possessed a firearm and who provided him with the firearm. Therefore, the Defendant's arguments that the warrant was overbroad and lacked particularity should be rejected. Because the property sought was limited to only those things connected with the crime under investigation, there is a "sufficient 'nexus' that satisfies the practical realities 'that enable the searcher to ascertain and identify things authorized to be seized.'" *Mesika,* 2018 2018 WL 2124899, at *10 (citing *United States v. Smith*, 918 F.2d 1501, 1507-08 (11th Cir. 1990)).

It should also be noted the while the Defendant claims that the warrant is overly broad and not sufficiently particular, he later claims that law enforcement's search impermissibly exceeded the warrant's scope; specifically, the Defendant states, "Sergeant Weigner went to court to seek a search warrant to obtain evidence of a specific offense – possession of a firearm by a juvenile delinquent – for which he had probable cause. […] That warrant did not authorize a search for evidence of access device fraud and identity theft." DE 157 at 17. The Defendant cannot claim that the warrant was overly broad (and therefore, not limited in scope by the probable cause on which the warrant was based), and then later claim that law enforcement was so limited by the scope of the warrant to the probable cause included in the warrant that evidence of fraud should be suppressed. Either the warrant was so limited that the officers were not permitted to review evidence of fraud, or it was limited enough. The Defendant cannot have it both ways.

In sum, based on the detailed facts in the affidavits and inferences rooted in common sense, the judge reviewing the City of Miami Search Warrant reasonably found that there was a fair probability that firearms-related evidence would exist in the Vernelus's Phone, and had existed for an indefinite period. The search warrant was sufficiently specific considering the

nature and circumstances of the Defendant's crime. The warrant authorized the seizure of evidence of the listed crime and user attribution, and the lack of a date restriction does not render the warrant unconstitutionally broad. *See Blake*, 868 F.3d at 973 n.7. (11th Cir. 2017) (confirming that the lack of a time limitation does not render a warrant unconstitutional).

**B.      Law enforcement relied on the search warrant in good faith**

Even if the search warrant here was deficient or improper, law enforcement's good faith reliance on the warrant prevents the application of the exclusionary rule in this case. *See United States v. Leon*, 468 U.S. 897 (1984). The exclusionary rule does not bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. *Id.* at 922. "The fact that a Fourth Amendment violation occurred ... does not necessarily mean that the exclusionary rule applies." *Herring v. United States,* 555 U.S. 135, 140 (2009). (citation omitted). In *Leon,* the Supreme Court held that the exclusionary rule should not be used to suppress valuable evidence of a crime unless the application and warrant were so defective or deficient that no reasonably well-trained officer would rely on it to authorize the search. *Id.* at 925. The Supreme Court has stated that the exclusion of evidence "has always been our last resort, not our first impulse." *Herring,* 555 U.S. at 140 (citation omitted) (internal quotation marks omitted). "The good faith exception applies to close calls and threshold cases." *United States v. McCall*, 84 F.4th 1325 (11th Cir. 2023); *see also Messerschmidt v. Millender*, 565 U.S. 535, 556, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012). The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States,* 564 U.S. 229, 235 (2011). In *Davis,* the Supreme Court emphasized the following:

> … the goal of deterrence must be balanced against the substantial social costs generated by the rule. Exclusion exacts a heavy toll on both the judicial system

> and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Id*. at 237. The Supreme Court further explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue." *Id*. Consequently, "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id*. at 238. (citation omitted). By contrast, "[w]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.* (citations omitted) (internal quotation marks omitted). The "good faith exception" is particularly relevant when officers act pursuant to a warrant. "'In the ordinary case, an officer cannot be expected to question' a judge's decision that the requirements for a warrant have been satisfied or that the form of the warrant is sufficient." *McCall*, 84 F.4th at 1323 (citations omitted); *See Leon*, 468 U.S. at 908 (suppressing evidence discovered pursuant to a warrant generally "cannot logically contribute to […] deterrence.").

There are four situations in which the good faith exception would *not* apply:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role . . .; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid.

> *Id*.; *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002); *United States v.*

15

*Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). In this case, neither of the first two scenarios exists (nor does the Defendant suggest as much). As to the third scenario, there was probable cause for the search warrant affidavit and it was certainly not "so devoid of probable cause that [the officers'] belief in its validity at the time it was issued was entirely unreasonable." *Martin*, 297 F.3d at 1313. "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *Id.* at 1314 (citations omitted). "To exclude evidence on this ground, the affidavit must be so clearly insufficient 'that it provided 'no hint' as to why police believed they would find incriminating evidence." *McCall*, 84 F.4th at 1325 (citing *United States v Morales*, 987 F.3d 966, 976 (11th Cir. 2021). The affidavit here sufficiently explained the criminal activity – that Vernelus possessed a firearm despite being prohibited from doing so – and established a connection between the crime and why evidence of the crime might exist on Vernelus's Phone. It was reasonable to believe that Vernelus's Phone would contain evidence of his possession of firearms and evidence related to the surveillance footage which Vernelus had sent to a friend via social media, which is typically accessed through a phone. The City of Miami Search Warrant affidavit also provides sufficient indica of probable cause that the phone would contain evidence regarding the person who the Defendant said provided him with the firearm. Any defects in probable cause were not obvious enough to negate the good faith exception. *See McCall,* 84 F.4d at 1226. "The affidavit contained sufficient indicia of probable cause to enable a reasonable officer to execute the warrant thinking it valid." *Martin*, 297 F.3d at 1314; *See United States v. Lee*, 2015 WL 5667102, *1, *12 ((N.D. Ga. Sept. 25, 2015) (court noted that even had the search warrants for the 35,000 Google emails been overbroad, the *Leon* good faith exception applied); *See Deppish*, 994 F. Supp. 2d at 1222 ("Because searches approved by a warrant are

favored, a magistrate's determination that probable cause exists is entitled to great deference....

because officers are generally not required to second-guess the magistrate's decision in granting

a warrant, evidence obtained pursuant to a warrant that is later found to be defective is not

properly excluded when the warrant is relied on by the officers in objective good faith.")

(internal quotations omitted); *See United States v. Shah*, 2015 WL 72118, at \*15-16 (E.D.N.C.

Jan. 6, 2015).

      Considering the the fourth scenario in which the good-faith exception does not apply, the

City of Miami Search Warrant is not so facially deficient that the executing officers could not

reasonably presume it to be valid, even if it violates the particularity requirement. Other

reasonable, well-trained law enforcement officers--not to mention a state prosecutor and a state

judge--believed the warrant passed muster here. *See United States v. Travers*, 233 F.3d 1327,

1330-31 (11th Cir. 2000) (affirming good faith of officers who consulted a supervisor and a

federal prosecutor while preparing their warrant affidavit and executing the search); *McCall,*

84 F.4th at 1329 ("Before acting on the warrant, he received approval from several other

individuals, including lawyers, that it passed factual and constitutional muster."). Any

particularity issue was not glaring or obvious to any reasonable officer. In *McCall*, the

government conceded that the warrant "fell short of the particularity requirement because it

allowed a search of all the conceivable data on the account without any meaningful limitation."

*McCall,* 84 F.4th at 1328. Despite the lack of a time limit in *McCall*, the Eleventh Circuit found

it was not so facially deficient that the officers could not have reasonably relied on it when

executing their iCloud search *Id.* The warrant in *McCall* specified seven categories of data that

officers were allowed to search, which was tailored to the specific crime under investigation; the

warrant did not include time limitations. While the Eleventh Circuit noted that those seven

categories "encompassed most of the account's conceivable data," the Court stated that evidence should not be suppressed "on overbreadth grounds if the warrant 'adequately conveys its parameters.'" *Id.* (citing *United States v. Delgado*, 981 F.3d 889, 899 (11th Cir. 2020)). The Court found that law enforcement "reasonably could have believed that the seven categories of iCloud information fell within the practical margin of flexibility for his broad investigative task, especially given the close connection between the cell phone used to commit the crime and the cloud account." *Id.*; *See Wuagneux*, 683 F.2d at 1349. The Court held that, "[e]ven if the warrant violated the particularity requirement, it was not so 'facially deficient' that the officers could not have reasonably relied on it when executing their iCloud search." *McCall*, 84 F.4th at 1328.[7]

Here, like in *McCall*, despite any possible deficiencies as to time limitations, it was *not entirely unreasonable* for law enforcement to believe that what was written in the affidavit would be sufficient to support a finding of probable cause. *Id.; See Blake*, 868 F.3d at 975 ("[W]hile the warrants may have violated the particularity requirement, whether they did is not an open and shut matter; it is a close enough question that the warrants were not 'so facially deficient' that the FBI agents who executed them could not have reasonably believed them to be valid."). Even though there was no time limit, like in *McCall*, the warrant specified twelve categories of data that officers were allowed to search, which were tailored to the specific crime under investigation, possession of a firearm by a juvenile delinquent. Given that the Defendant sent a video of himself committing this crime via social media, and given the likelihood that the phone would contain the video or other evidence of the Defendant possessing firearms, law enforcement reasonably presumed the warrant was valid.

---

[7] This area of law is still developing. The *McCall* opinion was published in 2023, three years after the warrant here was issued. An officer fails to act in good faith only when he violates clearly established law. And "clearly established" law means a Supreme Court or Eleventh Circuit ruling. *See Groh v. Ramirez*, 540 U.S. 551, 563-65 & n.8 (2004) (explaining that "the same standard of objective reasonableness" applies to the good-faith exception and qualified immunity). This fast-evolving landscape lacks clearly established circuit or Supreme Court law, so minor missteps should fall within the good-faith exception.

Law enforcement here reasonably relied on the City of Miami Search Warrant. "The good faith exception requires the [C]ourt to consider whether a reasonably well-trained officer would know that the warrant was illegal despite the magistrate's authorization." *Id.* at 1318; *See Leon,* 468 U.S. at 922, n. 23.  Law enforcement was entitled to rely upon the judge's evaluation and determination that given all the circumstances set forth in the affidavit, which provides a link between the Defendant's cell phone and the crime, that there was a fair probability that evidence of a crime would be found in the Defendant's phone. *See Gates*, 462 U.S. at 238; *see also United States v. Haynes*, 160 Fed. App'x 940, 944 (11th Cir. 2005) (The good faith exception is appliable to a search conducted pursuant to an overly broad warrant.) (quotations and citations omitted). The exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause. This is not the case here. *Martin*, 297 F.3d at 1320. Suppression here is not warranted because law enforcement acted in good faith – that is, their conduct was objectively reasonable.

### C.    The search here did not exceed the scope of the warrant

The fraud found in Vernelus's Phone was lawfully examined pursuant to the plain view doctrine. There are three requirements for valid seizures of evidence in plain view. "First, the officer must not have violated the Fourth Amendment in 'arriving at the place from which the evidence could be plainly viewed.' Second, the incriminating character of the evidence must be 'immediately apparent.' Third, the officer must have 'a lawful right of access to the object itself.'" *United States v. Menon,* 24 F.3d 550, 559–60 (3d Cir.1994) (quoting *Horton,* 496 U.S. 128, 141) (internal citations omitted). The examination of the files including fraud here, to the extent that they may arguably be said to have been "seized," satisfies all three plain view

requirements. First, neither City of Miami Sergeant Weinger nor FBI Special Agent Lavelle violated the Fourth Amendment in arriving at the place from which the evidence could be viewed. Second, there is no doubt that the incriminating character of the evidence—in this instance, the PII—was "immediately apparent." Third, both Sergeant Weinger and Special Agent Lavelle had a "lawful right of access" to the object of the search because they were authorized by a state search warrant to search the phone for firearms-related evidence and user attribution. *See United States v. Stabile*, 633 F.3d 219, 242 (3d Cir. 2011)

In *Horton v. California*, an officer obtained a warrant to search the defendant's house for the proceeds of a robbery. *See* 496 U.S. at 131. While executing the search warrant, the officer found, and subsequently seized, among other things, a machine gun, a .38–caliber revolver, two "stun guns," and a handcuff key. *Id.* The officer did not find, however, any evidence that the search warrant sought. *Id*. The officer testified that, while executing the search warrant, he was also looking for evidence outside the search warrant's scope. *Id*. Finding the officers subjective intentions during the search irrelevant, the Supreme Court explained that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant." *Id.* at 138. Because the items seized "were discovered during a lawful search authorized by a valid warrant," and their seizure was justified by the plain-view exception, the Supreme Court found the officer's search constitutional. *Id.* at 142. In justifying its holding, the Supreme Court stated that a hypothetical presented in the concurring and dissenting opinion of the Honorable Byron R.

White, Associate Justice of the Supreme Court, in *Coolidge v. New Hampshire,* 403 U.S. 443 (1971), is "instructive":

> Let us suppose officers secure a warrant to search a house for a rifle. While staying well within the range of a rifle search, they discover two photographs of the murder victim, both in plain sight in the bedroom. Assume also that the discovery of the one photograph was inadvertent but finding the other was anticipated.... [I]n terms of the minor' peril to Fourth Amendment values there is surely no difference between these two photographs: the interference with possession is the same in each case and the officers' appraisal of the photograph they expected to see is no less reliable than their judgment about the other. And in both situations the actual inconvenience and danger to evidence remain identical if the officers must depart and secure a warrant.

*Horton,* 496 U.S. at 139 (quoting *Coolidge,* 403 U.S. at 516, (White, J., concurring and dissenting)). Although the Supreme Court did not explain whether the officer discovered the guns and other incriminating items simultaneously, or at different points while executing the search warrant, its holding is clear: so long as an officer acts within the scope of the search warrant—*i.e.,* searches only items that may reasonably contain the evidence that the warrant seeks—it is irrelevant whether the officer either intends to find or inadvertently discovers evidence outside of the warrant's scope. *See Horton,* 496 U.S. at 142. The scope of a search conducted pursuant to a warrant is defined *objectively* by the terms of the warrant and the evidence sought, not by the *subjective* motivations of an officer. *See Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) ("Thus, the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe it may be found'" (quoting *Ross,* 456 U.S. at 824, 102 S.Ct. 2157)); *see also Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

In this case, the City of Miami Search Warrant authorized a search of Vernelus's Phone for evidence relating to the designated Florida crime of possessing a firearm as a juvenile

delinquent. To conduct that search, the warrant impliedly authorized officers to open each file on the phone and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization. *See United States v. Williams*, 592 F.3d 511, 521–22 (4th Cir. 2010). "When a search requires review of a large collection of items, such as papers, 'it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.'" *Id.* at 519–20 (quoting *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)). "[I]t is clear that because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of [a] hard drive may be required." *Stabile,* 633 F.3d at 237; *See United States v. Hill,* 459 F.3d 966, 977–78 (9th Cir.2006); *United States v. Gray,* 78 F.Supp.2d 524, 527 n. 5 (E.D.Va.1999) ("[C]omputer files can be misleadingly labeled, particularly if the owner of those files is trying to conceal illegal materials"); *see also United States v. Riley,* 906 F.2d 841, 845 (2d Cir.1990) ("[F]ew people keep documents of their criminal transactions in a folder marked 'drug records'"). Suspects can easily hide information by mislabeling files, and, therefore, law enforcement officials are not required to accept a suspect's designation of what is contained in a particular file. *See Hill,* 459 F.3d at 978 ("Forcing police to limit their searches to files that the suspect has labeled in a particular way would be much like saying police may not seize a plastic bag containing a powdery white substance if it is labeled 'flour' or 'talcum powder.'" (quoting *United States v. Hill,* 322 F.Supp.2d 1081, 1090 (C.D.Cal.2004))).*See United States v. Burgess,* 576 F.3d 1078, 1092–94 (10th Cir.2009) ("[T]here may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders, and that is true whether the search is of computer files or physical files."); *Mann,* 592 F.3d at 782 (relevant files are often hidden and

22

can be mislabeled and "manipulated to hide their true contents"); "Law enforcement officials who have obtained a warrant to search a computer are not required to limit their search in accordance with a suspect's description of his files." *United States v. Highbarger*, 380 F. App'x 127, 130 (3d Cir. 2010); s*ee, e.g., United States v. Giberson,* 527 F.3d 882, 889–90 (9th Cir. 2008); s*ee, e.g., United States v. Adjani,* 452 F.3d 1140, 1150 (9th Cir. 2006).

"Once it is accepted that a computer search must, by implication, authorize at least a cursory review of each file on the computer, then the criteria for applying the plain-view exception are readily satisfied." *Williams*, 592 F.3d at 521–22; *See United States v. Miranda*, 325  F. App'x 858, 859-60 (11th Cir. 2009) (per curiam) (unpublished) (upholding unfiltered search because officer had "lawful right to view each file to determine whether or not it was evidence of" subject crimes and discovered contraband); *United States v. Wong*, 334 F.3d 831, 834 (9th Cir. 2003) (upholding unfiltered search through computer image files where officer discovered child-pornography during warrant-authorized search of appellant's computer for "maps"); *Mann,* 592 F.3d 779 (search through files for voyeurism uncovered child pornography); *United States v. Burgess*, 576 F.3d 1078, 1094-95 (10th Cir. 2009) (upholding preview of all image files as "thorough search" for relevant evidence of drug trafficking); *United States v. Triplett*, 684 F.3d 500, 505-06 (5th Cir. 2012) ("Although officers should limit exposure to innocent files, for a computer search, in the end, there may be no practical substitute for actually looking in many (perhaps all) folders and sometimes at the documents contained within those folders.")(citation and internal quotations omitted). Here, having established a nexus between the crime alleged in the warrant and Vernelus's Phone, a thorough search of the phone extraction was the only practical way to determine whether the phone contained evidence of the crimes under investigation or any other information responsive to the specific categories of information

23

set forth in the warrant. Here, City of Miami Sergeant Weinger observed PII and communications about fraud while determining whether or not it was evidence of the subject crime. The FBI, while continuing the warrant-authorized search for firearms-related evidence, continued to come across evidence of fraud and thereafter memorialized the evidence of fraud located in the phone extraction. *See United States v. Loera*, 59 F. Supp. 3d 1089, 1159 (D.N.M. 2014), aff'd, 923 F.3d 907 (10th Cir. 2019), and aff'd, 923 F.3d 907 (10th Cir. 2019).

In *United States v. Miranda*, an Eleventh Circuit case, law enforcement obtained a search warrant to search the defendant's laptop computer, external hard drive, and uninstalled hard drive for evidence of counterfeit software. *Id*. at 859. Law enforcement searched the hard drive, and in doing so, "the officer had a lawful right to view each file to determine whether or not it was evidence of counterfeiting crime." *Id*. at 860 (citing to *United States v. Slocum*, 708 F.2d 587, 604 (11th Cir. 1983)). During the search, law enforcement discovered images constituting child pornography. The Court held that because the child pornography photographs were intermingled with counterfeiting files, they were in plain view, and "[o]nce the officer saw child pornography on Miranda's hard drive, its incriminating character was immediately apparent, so the officer could seize the files." *Id*. (citing *United States v. Smith*, 459 F. 3d 1276, at 1290 (11th Cir. 2006)).

Given that law enforcement was executing a facially valid warrant to seize firearms evidence within Vernelus's Phone, they were lawfully in a place to seize any photographs and videos of the Defendant possessing firearms, which were intermingled with other photographs and videos on his phone, including photographs depicting PII. They were also lawfully in a place to seize communications about fraud, which were intermingled with other conversations that law enforcement was permitted to review pursuant to the warrant. For example, in the same chat that

Vernelus asks fellow LHV members for a "cvv," he also discusses selling "sticks" or firearms. Further, knowing that Vernelus was an associate of LHV, law enforcement was well-aware of Vernelus's possible involvement in fraud schemes. Accordingly, the incriminating nature of the fraud was readily apparent, and seizure of photographs and videos of the Defendant with fraud appropriate, thus satisfying *Horton, Hicks*, and their progeny. See *United States v. Rogers,* 924 F.3d 219, at 222-23 (11th Cir. 1991)(incriminating nature of gun immediately apparent because officer knew defendant was convicted felon).

"'Absent a flagrant disregard of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized,'" and "total suppression of all items seized 'is not appropriate unless the executing officers' conduct exceeded any reasonable interpretation of the warrant's provisions.'" *United States v. Hill,* 2014 WL 5410214, at *8 (S.D.Ga. Oct.23, 2014) (quoting *United States v. Khanani,* 502 F.3d 1281, 1289 (11th Cir.2007)). "Nor does the use of officer discretion in reviewing items before deciding whether to seize them amount to flagrant disregard of the terms of the warrant," since "[t]he practical realities of a search permit a brief perusal of items to determine what is authorized by a warrant." *Id.* (citations omitted) (citing *Miranda*, 325 Fed. App'x at 860). Indeed, "[t]he extreme remedy of blanket suppression should only be imposed in the most 'extraordinary' of cases.'" *United States v. Brooks,* 2014 WL 292194, at *15 (M.D.Fla. Jan.27, 2014) (alteration in original) (quoting *United States v. Foster,* 100 F.3d 846, 852 (10th Cir.1996)).

**D. Law enforcement would have inevitably discovered the fraud-related evidence through other lawful means**

**a. Law enforcement would have discovered the fraud-related evidence through evidence and leads already in their possession.**

Law enforcement began to investigate LHV in August 2020. Vernelus was known to the FBI as a member or associate of LHV and as a possible "shooter" as early as December 2020, before the FBI even obtained Vernelus's Phone from the City of Miami (in January 2021). On February 24, 2021, law enforcement conducted an interview of another known gang member of LHV, CADET. CADET admitted to using the dark web to get credit card information and admitted to being involved in fraud schemes with another LHV gang member. CADET advised law enforcement that he was friends with Vernelus, and that Vernelus used Facebook to "stir stuff up with opposing gang members."

On August 25, 2021, a cell phone was seized from another known gang member of LHV, ST LUC. On September 7, 2021, a Florida state search warrant was issued authorizing the search of the phone belonging to ST LUC. Law enforcement discovered a group chat in ST LUC's Phone which included known LHV members or associates WOODARD,[8] CADET, and Vernelus at his phone number, 509-907-2657. Vernelus initiated the chat. On October 31, 2020, Vernelus asked if anybody in the group had a "cvv." One of the other unidentified participants of the group chat sent PII (including a Victim's name, address, and complete credit card number) to the group. On November 4, 2020, Vernelus again asked for a "cvv." Law enforcement also located the PII of at least 103 individuals within ST LUC's phone. Law enforcement also located a text message that ST LUC sent to CADET on July 29, 2020 containing a photograph including social security numbers belonging to other people. In January and February 2023, law enforcement observed photographs of Vernelus with large amounts of money on social media. *See* Paragraph I.D, above.

---

[8] It should be noted that law enforcement obtained a warrant to search a phone seized from WOODARD on April 12, 2021. The phone was forensically examined pursuant to the warrant and law enforcement located PII belonging to at least 53 individuals.

The exclusionary rule bars admission of evidence resulting from a Fourth Amendment violation, unless an exception applies. One of the exceptions to the exclusionary rule is when unconstitutionally obtained evidence would ultimately have been discovered through lawful means had there been no constitutional violation. *See Nix v. Williams*, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The government has the burden of proving that exception applies. *Id.* at 444, 104 S.Ct. 2501. Under the doctrine of inevitable discovery, despite an illegal search, "if the prosecution can establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means, the evidence will be admissible." *United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix*, 467 U.S. at 434); *see also United States v. Watkins*, 10 F.4th 1179 (11th Cir. 2021) (concluding that the preponderance of evidence standard – rather than the reasonable probability standard – applies to the inevitable discovery doctrine and overruling any decision holding to the contrary). The preponderance standard of proof requires the proponent provide evidence that "is more convincing than the evidence offered in opposition to it." *Watkins*, 10 F.4th at 1184 (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997)). In other words, the evidence must "persuade[ ] the trier of fact that a proposition 'is more likely true than not true.'" *Id.* (quoting *United States v. Deleveaux*, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000)).

For the inevitable discovery doctrine to apply, the prosecution must also show that "the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct." *Virden*, 488 F.3d at 1322. (quotation marks and citation omitted) (emphasis in original). However, "'[a]ctive pursuit' does not require that police have already planned the particular search that would obtain the evidence. The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary

27

investigations of evidence or leads already in their possession.'" *United States v. Senese*, 798 F. App'x 499, 501 (11th Cir.), *cert. denied,* 141 S. Ct. 306 (2020) (quoting *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015)). *See United States v. Palmer*, 2021 WL 6941280, at *27 (M.D. Fla. Nov. 23, 2021), report and recommendation adopted, 2022 WL 485248 (M.D. Fla. Feb. 17, 2022). "The key to applying this doctrine is to place the government officers in the 'same positions they would have been in had the impermissible conduct not taken place,' and, from that vantage point, to ask whether the government would have inevitably discovered the evidence lawfully." (1984). *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019) (citing *Nix*, 467 U.S. 431).

Ordinary investigations of evidence and leads would have led the FBI to have inevitably discovered the fraud on Vernelus's Phone through lawful means independent from any possible unlawful search. *See United States v. Loera*, 923 F.3d at 928. Here, LHV had been under investigation for several months before the City of Miami Search Warrant was issued and executed. *See United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) (The "lawful means" need not be a second, independent investigation). By the time FBI Special Agent Lavelle reviewed the phone extraction, Vernelus was already known by the FBI and being investigated for his connections to violent acts committed by LHV. Therefore, the investigation into Vernelus began before, and was independent of, the search of Vernelus's Phone by the FBI which revealed the fraud Vernelus now seeks to suppress. *See Johnson*, 777 F.3d at 1277 (applying inevitable discovery doctrine in affirming denial of motion to suppress, where the "investigation . . . began before, and was independent of, [the] illegal search"). Further, law enforcement observed fraud on Vernelus's phone in plain view pursuant to the City of Miami Search Warrant. Such information would have been sufficient to establish probable cause to support a warrant to

specifically search for fraud on the phone. *See Loera*, 923 F.3d at 929. Apart from the fraud observed in plain view by the City of Miami, the pending investigation would have led the FBI to request a warrant of Vernelus's phone when they located a chat on a phone belonging to another LHV member, ST LUC, which was initiated by Vernelus and requested fraud. Together with the chat wherein Vernelus requests fraud, Vernelus's association with other members of LHV who were engaged in fraud, and photos of Vernelus with large amounts of cash despite no reported wages and earning, would have led investigators to obtain a warrant to search Vernelus's Phone and would have ultimately led to the discovery of the PII in Vernelus's Phone.

It is more likely true than not that the government would have obtained a valid warrant to search Vernelus's phone for evidence of fraud. The evidence of fraud derived from the phone that was seized is therefore admissible under the inevitable-discovery doctrine. There was probable cause to believe the phone contained evidence of fraud and was used to commit crimes, and a warrant to search the phone for fraud, was and would have been supported by probable cause *See United States v. Lazzaro*, 637 F. Supp. 3d 640 (D. Minn. 2022); *U.S. v. Morales-Ortiz*, 376 F. Supp. 2d 1131 (D.N.M. 2004) ("Contents of defendant's cell phone and pager were admissible under the inevitable discovery doctrine, even though the phone and pager were unlawfully searched; phone and pager would have been searched legally pursuant to subsequently issued search warrant."). Even if FBI Special Agent Lavelle had never searched the phone, a preponderance of the evidence supports the conclusion that law enforcement would have discovered the incriminating evidence by lawful means, and the evidence is therefore admissible.

      **b.  A search of the Defendant's phone by probation would have uncovered the evidence of fraud**

The facts here demonstrate a reasonable probability that the evidence of fraud would have been discovered inevitably through lawful means, specifically through a reasonable warrantless search of the Defendant's phone for evidence of a probation violation. *See Johnson*, 777 F.3d at 1274; *See United States v. Bishop*, 683 F. App'x 899 (11th Cir. 2017).

To start, a warrantless search of Vernelus's Phone by probation would have been reasonable under the balancing test set forth in *United States v. Knights*, 534 U.S. 112, 118–19, 122 S.Ct. 87, 151 L.Ed.2d 497 (2001); *see Bishop*, 683 F. App'x at, 907–08. In *Knights*, the Supreme Court examined the reasonableness of a warrantless search by a law-enforcement officer of a probationer for investigative purposes. *See Knights*, 534 U.S. at 115–16. The Court explained "that the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 118–19. "Because probationers subject to a condition authorizing warrantless searches have a greatly diminished expectation of privacy, while the government has a considerable interest in supervising probationers, the Court held that warrantless searches of a probationer subject to a search condition based on reasonable suspicion are reasonable under the Fourth Amendment." *Bishop*, 683 F. App'x at 907-908 (discussing *Knights*, 543 U.S. at 119–21, 122 S.Ct. 587).

In *United States v. Yuknavich*, the Eleventh Circuit extended *Knights* to a situation in which no warrantless probation search condition was present. 419 F.3d 1302, 1309–10 (11th Cir. 2005). The Eleventh Circuit stated that the government had a "considerable interest" in supervising probations and that Yuknavich, who was on probation for distributing material involving child pornography, had a "greatly reduced expectation of privacy in his computer." *Id.* at 1309–11. The Eleventh Circuit determined that even though the probation order

30

lacked an explicit condition allowing warrantless searches and Georgia did not have a regulation requiring Yuknavich to submit to warrantless searches, probation officers did not need more than "reasonable suspicion" to conduct a search of the probation's computer. *Id.* at 1310–1311. Reasonable suspicion consists of "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Bishop*, 683 Fed.Appx. 899, 908 (citing *Yuknavich*, 419 F.3d at 1311).

Here, Vernelus was on probation in state of Florida cases F17-15721 and F17-15722, each which charged him with Possession of a Firearm by a Delinquent, between January 19, 2018 and December 10, 2020, when the City of Miami Search Warrant was executed.[9] Vernelus's legitimate expectation of privacy in his phone was greatly reduced both by a warrantless search condition of his home included in the "Instructions to the Offender," signed by, and provided to, Vernelus on July 13, 2018. *See* Exhibit 1. Specifically, Vernelus was instructed that, "Probation Officers have the right to search your residence." According to the Order of Community Control/Probation, Vernelus was prohibited from "possess[ing], carry[ing], or own[ing] any firearm" while on probation. *Id.* Vernelus therefore had a greatly diminished expectation of privacy. Additionally, the government's interests in supervision were significant. *See Knights*, 534 U.S. at 120, 122 S.Ct. 587; *Yuknavich*, 419 F.3d at 1310. Accordingly, no more than reasonable suspicion was needed to search Vernelus's residence, and his phone, which was located inside of his home.

Reasonable suspicion to search Vernelus's residence, including his phone, existed. Reasonable suspicion exists when, under the totality of the circumstances, officers have a particularized and objective basis for suspecting legal wrongdoing. *Yuknavich*, 419 F.3d at 1311. For this analysis, the Court should consider the facts known to Vernelus's Probation

---

[9] The judgments and sentences in cases F17-15721 and F17-15722 were ultimately vacated in December 2020.

Officer before the City of Miami Search Warrant was obtained. As previously stated, on October 9, 2020, Vernelus's Defendant's probation officer conducted a curfew check at Vernelus's home. Later the same day, Vernelus's wife contacted Vernelus's probation officer to inform him that after the probation officer left, Vernelus told her that the probation officer was looking for a gun, but that luckily, he had hidden his gun in another room in a safe. Vernelus's wife also notified Vernelus's probation officer stating that she "just found out [Vernelus] does fraud." Probation was also aware of the video of Vernelus in possession of a firearm, located by the City of Miami on November 2, 2020. In light of these facts, probation had reasonable suspicion to suspect that Vernelus had violated his probation. Here, there is a reasonable probability that the evidence the Defendant now seeks to suppress would have been discovered during a lawful search of Vernelus's hone and phone for evidence of a probation violation. In sum, the first requirement for the inevitable-discovery doctrine was met because the government established lawful means that made discovery inevitable. *See Bishop*, 683 F. App'x at 909; *See Johnson*, 777 F.3d at 1274.

Turning to the second requirement for the inevitable discovery doctrine—that the lawful means that made discovery inevitable were being "actively pursued" prior to the occurrence of the illegal conduct—here, based on the information received from the offender's wife, a search would have been planned by Probation. As previously noted, the Eleventh has explained that "'[a]ctive pursuit' does not require that police have already planned the particular search that would obtain the evidence. The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'" *Johnson*, 777 F.3d at 1274–75 (quoting *Virden*, 488 F.3d at 1323); *see Johnson*, 777 F.3d at 1275 ("[T]he purpose of the requirement of active pursuit is to exclude evidence that was not being sought in any fashion."). Here, the investigation into whether Vernelus possessed

a firearm and was engaged in fraud-related activity while on probation is "the lawful means which made discovery inevitable." *See id.* And those means were being "actively pursued" because, probation would have searched the residence and phone if the City of Miami had not obtained a warrant. That search, in turn, would have been lawful and likely would have led to the discovery of the fraud on Vernelus's Phone.

Applying the exclusionary rule in these circumstances would "effectively punish the government for the City of Miami's decision to apply for a warrant that was not necessary." *Bishop*, 683 F. App'x at 910. In other words, if this Court was to rule in Vernelus's favor, the court "would put the government in a worse position than had the [alleged] police misconduct not occurred, an outcome that the inevitable discovery exception was fashioned to avoid." *See Bishop*, 683 F. App'x at 910 (quoting Johnson, 777 F.3d at 1275). "Subtract the illegal search from the factual picture in this case and nothing of substance would have changed." *Bishop*, 683 F. App'x at 910 (quoting Johnson, 777 F.3d at 1275) (internal quotation marks omitted).

Even if the City of Miami had not obtained a warrant to search Bishop's phone, the probation officer still would have found the fraud-related evidence on Venelus's Phone subject of the indictment in this case. Because the evidence from Vernelus's Phone would have been obtained inevitably by lawful means being actively pursued, there is no rational basis to suppress the evidence even if the City of Miami Search Warrant was invalid. *See Nix*, 467 U.S. at 447, 104 S.Ct. 2501.

Therefore, the fraud-related evidence is admissible under the inevitable-discovery doctrine. *See Bishop,* 683 F. App'x at 907 ("Here, even assuming arguendo that the search warrant affidavit was wholly deficient and that the good-faith exception does not apply, the

district court still properly denied Bishop's suppression motion because the evidence of child pornography was admissible under the inevitable-discovery doctrine. Accordingly, we need not and do not address the issue of good faith.").

**E. The fraud-related evidence should not be suppressed pursuant to the independent-source doctrine**

The government has obtained a federal warrant authorizing law enforcement to review the phone extraction of Vernelus's Phone for evidence that Vernelus was engaged in a conspiracy to commit fraud. *See* 23-mj-04308-Reid; Exhibit 2, attached. The independent source doctrine permits the search the phone extraction of Vernelus's Phone pursuant to this warrant. The independent source doctrine "rescues from exclusion" unlawfully obtained evidence later discovered through a "genuinely independent" source, usually a warrant. *U.S. v. Hill*, 776 F.3d 243, 250 (4th Cir. 2015); *Murray v. U.S.,* 487 U.S. 533, 542 (1988).

In *United States v. Hernandez,* the Fourth Circuit affirmed the district court's denial of a motion to suppress evidence. 702 F. App'x 151, 154 (4th Cir. 2017). The Court found that under the independent source doctrine, evidence obtained from the search of a defendant's cell phone was admissible, even though the underlying search was not based on voluntary consent; the Court found that the search of the defendant's cell phone pursuant to a subsequent warrant was "genuinely independent" of the initial illegal search. *Id.;* See *Murray*, 487 U.S. at 542. The evidence was initially suppressed by the district court and ruled inadmissible because the underlying search was not based on voluntary consent; the district court later allowed the evidence under the independent source doctrine. *Id. at* 153. In *Hernandez*, the government applied for and was granted a warrant between the hearing on the motion to suppress and the filing of Court's Memorandum and Recommendation recommending that the evidence obtained from the phone be suppressed. *Id.* The district court thereafter considered whether the

independent source doctrine permitted the search of a cell phone conducted pursuant to a valid warrant, but subsequent in time to an illegal search based on consent. *United States v. Hernandez*, 2015 WL 13227857, at *4 (W.D.N.C. Dec. 11, 2015), report and recommendation adopted, 2016 WL 299043 (W.D.N.C. Jan. 25, 2016), aff'd, 702 F. App'x 151 (4th Cir. 2017).

The "independent source doctrine applies to both the 'rediscovery of intangible evidence already discovered' and the 'reseizure of tangible evidence already seized.'" *United States v. Soto*, 799 F.3d 68, 82 (1st Cir. 2015) (citing *Murray*, 487 U.S. at 542); *see also id.* ("So long as a later, lawful seizure is genuinely independent of an earlier, tainted one ... there is no reason why the independent source doctrine should not apply."). To be admissible through the independent source doctrine, (1) the agent's decision to secure a warrant must not have been prompted by observations made during the unlawful entry, and (2) the information obtained during the illegal search must not have been presented to the magistrate and affected the magistrate's decision to issue the warrant. *Hernandez*, 2015 WL 13227857, at *4; *Murray*, 487 U.S. at 534, 542; *Noriega,* 676 F.3d 1252, 1260–61 (11th Cir.2012).

Here, the first prong of the independent source exception is met. There is ample evidence that law enforcement would have sought a search warrant for Vernelus's Phone absent the search performed in reliance on the City of Miami Search Warrant. As discussed above, Vernelus was the subject of an ongoing investigation, which revealed several examples of Vernelus engaged in a conspiracy to commit fraud. Probable cause existed to search Vernelus's Phone even without the observations FBI Special Agent Lavelle made when reviewing Vernelus's Phone and finding fraud. The agent would have sought a warrant had the illegal search not occurred. As to the first prong, "whether the agent's decision to seek the warrant was affected by the illegal search is not solely a subjective test." *Hernandez*, 2015 WL 13227857, at *4; *See Murray*, 487 U.S. at 540

n.2 ("To say that a district court must be satisfied that a warrant would have been sought without the illegal entry is not to give dispositive effect to police officers' assurances on the point."). "Rather, the Court may look to objective evidence that suggests that a warrant application was not prompted by observations made during an illegal search. For example, that the subject of the search has also been the subject of an ongoing investigation and surveillance is evidence that the agent would have sought a warrant had the illegal search not occurred." *Hernandez*, 2015 WL 13227857, at *4; *See* <u>Murray</u>, 487 U.S. at 540; *United States v. Walton*, 56 F.3d 551 (4th Cit. 1995). "Neither the agent's subjective motivation to seek a warrant subsequent to an unlawful search, nor the good-faith character of the initial unlawful search, has been found relevant to the inquiry." *Hernandez*, 2015 WL 13227857, at *4; *See* <u>U.S.  v. Johnson</u>, 994 F.2d 994, 987 (2d Cir. 1993) (district court's reservation about the legality of the agent's review of audio tapes as incident to arrest prompted the Government's warrant application; "Whether the agents made their mistake in good faith is not relevant to this inquiry."); *See* <u>U.S.  v. Mulder</u>, 889 F.2d 239, 241-42 (9th Cir. 1989) (two-year delay in obtaining a warrant did not inhibit agents' reliance on the independent source doctrine where the Government obtained the property lawfully and the time lapse was the result of judicial processes rather than dilatory tactics on the part of the Government). Nor does it matter that the agent here applied for a warrant when it appeared that the fraud discovered on the phone may be suppressed. *See Hernandez*, 2015 WL 13227857, at *4; ("That the agents only applied for a warrant when it appeared that the consent on which they had relied to conduct the initial search might be invalidated does not obscure the objective circumstances noted above that suggest that agents would have otherwise sought a warrant for the subject telephone.").

To satisfy the second prong, information obtained during the illegal search must not have been "presented to the [m]agistrate *and* affected his decision to issue the warrant." *Murray*, 487 U.S. at 542 (emphasis added). Here, the affidavit for the search of the phone extraction did not discuss any of the fraud observed by Agent Lavelle during the FBI's review of the phone. While the government did reference the pending motion to suppress, doing so was necessary to dispel any notion of impropriety for failing to alert the reviewing judge of the pending motion. *See Hernandez*, 2015 WL 13227857, at *4. The note did not contain information about what the FBI observed when reviewing the phone. The affidavit reviewed by the magistrate judge provided ample probable cause for the magistrate judge to issue a warrant. The affidavit provided ample probable cause. "The affidavit presented facts such that any reasonable magistrate judge would have found sufficient probable cause to issue a warrant." *Hernandez*, 2015 WL 13227857, at *4.

"The independent source doctrine operates to allow evidence obtained in violation of a defendant's constitutional rights to escape exclusion when it is obtained through a separate and proper source." *Murray*, 487 U.S. at 538-39. This doctrine applies to evidence observed during a warrantless search that is later obtained pursuant to a valid warrant. *Id.; U.S. v. Bullard*, 645 F.3d 237 (4th Cir. 2011); *Walton*, 56 F.3d at 551; *Hill*, 776 F.3d at 243. Here, even if FBI Agent's discovery of PII and other fraud-related evidence on the phone was a violation of the defendant's constitutional rights, the government has obtained a separate and proper source to review the evidence. The independent source doctrine permits law enforcement to search Vernelus's Phone pursuant to the federal warrant and, therefore, this Court should not suppress the evidence.

## <u>Conclusion</u>

The warrant for Vernelus's Phone was supported by probable cause, was not overbroad, and was sufficiently particularized. Alternatively, the good faith exception to the exclusionary

rule under *Leon*, applies to the warrant. Law enforcement executing the facially valid warrant observed fraud in plain view. Ordinary investigations of evidence and leads would have led the FBI to have inevitably discovered the fraud on Vernelus's Phone through lawful means independent from any possible unlawful search. Alternatively, there is a reasonable probability that the evidence of fraud would have been discovered inevitably through a reasonable warrantless search of the Defendant's phone by probation for evidence of a probation violation. The independent source doctrine permits law enforcement to search Vernelus's Phone pursuant to a "genuinely independent" source ---the new-obtained federal search warrant.

For the reasons detailed above, the Defendant's motion should be denied.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   */s/ Elena Smukler*
ELENA SMUKLER
Assistant United States Attorney
Florida Bar No. 91025
U.S. Attorney's Office
99 N.E. 4th Street
Miami, FL 33132-2111
Telephone: (305) 961-9444
Email: Elena.Smukler@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that I electronically filed the foregoing document under seal with the Clerk of the Court, on November 21, 2023.

*/s/ Elena Smukler*
ELENA SMUKLER
Assistant United States Attorney